# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| CHARLES L. MAROHN, JR., | Case No. 21-CV-01241 (JRT/LIB) |
| Plaintiff, | |
| v. | |
| THE MINNESOTA BOARD OF ARCHITECTURE, ENGINEERING, LAND SURVEYING, LANDSCAPE ARCHITECTURE, GEOSCIENCE, AND INTERIOR DESIGN, and THE BOARD'S MEMBERS, Paul Vogel, Chair, Dave Blume, Vice Chair, Wayne Hilbert, Meg Parsons, Tari Rayala, Nirmal Jain, Denise Kazmierczak, Daniel Kelsey, Melisa Rodriguez, Dan Baar, Scott Robinson, Graham Sones, Keith Rapp, Robert Whitmyer, Erica Larson, Claudia Reichert, Rachel Dwyer, Eric Friske, Scott Holm, Jami Neiber, and David Stenseth, in their official capacities, or their successors, | **PLAINTIFF'S MEMORANDUM IN RESPONSE TO DEFENDANTS' MOTION TO DISMISS** |
| Defendants. | |

## INTRODUCTION

This lawsuit involves a Minnesota statute regulating the engineering profession. More specifically, Minn. Stat. §326.02 subd. 3(b) prohibits any person in Minnesota from stating the person is a "professional engineer" – not a *licensed* professional engineer – just a professional engineer. More importantly, §326.02 subd. 3(b)'s prohibition is total – the prohibition applies in all circumstances including social gatherings and most egregiously in this case, political advocacy. In *Nat'l Inst. of Family Life Advocates v. Becerra* ("*NIFLA*"), 138 S.Ct. 2361, 2371 (2018), the Supreme Court unequivocally

rejected the "professional speech" doctrine and held professional regulations banning speech are subject to strict scrutiny.  Section 326.02 subd. 3(b) is facially overbroad and cannot survive strict scrutiny under *NIFLA*.

Plaintiff Charles L. Marohn, Jr. ("Marohn") is a Minnesota licensed professional engineer.  In 2009, Marohn founded Strong Towns, a Minnesota non-profit corporation dedicated to educating the general public regarding local government decisions on land use, capital investment, and community development and how those decisions can result in insolvency or fiscal pressure on local government.  Since 2012, Marohn has exclusively engaged in political speech advocating local governments spend less money on engineering projects—political advocacy which is directly contrary to the economic interests of professional engineers.  Not surprisingly, Marohn's work with Strong Towns has not made him popular with many professional engineering businesses and related trade associations and organizations.

Marohn ceased practicing as an engineer 2012.  Despite this, Marohn continued to maintain his biennial license as a professional engineer under Minn. Stat. §326.02 with the Minnesota Board of Architecture, Engineering, Land Surveying, Landscape Architecture, Geoscience, and Interior Design (the "Board"). In 2016, Marohn moved to a new address and did not receive the biennial notice from the Board to renew his license. As a result, Marohn did not renew his biennial registration by July 1, 2018 even though Marohn continued to attend and pay for 24 hours of continuing education classes in professional engineering under Minn. Stat. §326.107 from July 1, 2016 through June 30, 2018 in order to maintain his license.  When Marohn realized his license had lapsed in

2020, Marohn simply needed to submit his registration materials online to the Board to reinstate his license. Marohn did so and the Board reinstated his professional engineering license in 2020 without comment.

One month after reinstating Marohn's license in July, 2020, the Board notified Marohn that a complaint had been filed against him by a professional engineer from another state. The complaint claimed that while Marohn was engaged in politically advocating that local governments reduce their expenditures on engineering projects, Marohn had referred to himself as a "professional engineer" on the Strong Towns website, during speaking engagements and in Strong Town publications. Minn. Stat. §326.02, subd. 3 had been amended in 2014 to provide it was unlawful for anyone other than a currently licensed professional engineer to describe themselves as "professional engineer" under any circumstances. Despite the fact that the Board admitted Marohn had not engaged in providing any engineering services to anyone during the period in which his license had lapsed, the Board threatened to sanction Marohn unless Marohn entered into a stipulated settlement in which Marohn would have to agree that he had violated Minnesota law and had engaged in dishonesty even though the Board admitted Marohn had not engaged in any engineering practice during those two years.

Marohn brought this civil-rights lawsuit under 28 U.S.C. § 2201(a) and 42 U.S.C. § 1983 to challenge the constitutionality of certain provisions of Minn. Stat. §326.01 *et seq.* and Minnesota Rules 1800 and 1805 and the Board's retaliation against Marohn for exercising his First Amendment rights.

The Board has moved to dismiss the Complaint.  The Board argues that under *Younger v. Harris*, this Court cannot grant relief because the Board commenced a disciplinary proceeding against Marohn *after Marohn filed this action*.  The Board's arguments fail because this action does not implicate important state interests, Minn. Stat. §326.02, subd. 3 is "patently unconstitutional," and the Board is proceeding in bad faith. The Board's motion should be denied.

## FACTS

### A. Background.

Marohn is a Minnesota licensed professional engineer, an urbanist, a land-use planner, an author, and a public speaker. *Complaint, ¶10.*  Marohn earned a bachelor's degree in civil engineering from the University of Minnesota in 1995 and a Masters of Urban and Regional Planning in 2004 from the University of Minnesota.  *Complaint, ¶11.* Marohn obtained a license from the Board to practice as a professional engineer on February 8, 2000.  *Complaint, ¶12.*

Shortly after licensure in 2000, Marohn started his own professional planning and engineering firm, Community Growth Institute, LLC.  Community Growth Institute, LLC engaged in both professional planning and engineering working exclusively on behalf of local governments.  *Complaint, ¶13.*  During the next ten years, Marohn found that local governments were spending monies on infrastructure projects that were a waste of money and were making the communities those local governments represented poorer. *Complaint, ¶14.*  As a result, in 2009, after representing local governments as a practicing professional engineer and land-use planner, and experiencing frustration with the amount

of taxpayer monies local governments wasted on transportation, infrastructure, and development projects, Marohn founded Strong Towns, a nonprofit corporation based in Minnesota that advocates for, among other reforms, local governments to spend less taxpayer dollars on construction and infrastructure projects. *Complaint, ¶15.* Marohn phased out his private practice and closed Community Growth Institute, LLC in 2012. *Id.*

Strong Towns advocates an approach to urbanism that avoids the construction of unnecessary infrastructure and hence the costs of building and maintaining unnecessary infrastructure. *Complaint, ¶16.* Strong Towns provides education and information to the public, both in and out of Minnesota, in an effort to assist the public in being better advocates for appropriate infrastructure projects in their localities. *Complaint, ¶17.* Strong Towns maintains a website that provides news and commentary related to urbanism, urban planning, land-use planning, and infrastructure projects. *Complaint, ¶18.* In conjunction with his work, Marohn is also the author of *Strong Towns: A Bottom-Up Revolution to Rebuild American Prosperity*, published by Wiley & Sons in 2019 and the soon to be published book *Confessions of a Recovering Engineer: A Strong Towns Approach to Transportation*, published by Wiley and Sons. *Complaint, ¶¶19-20.*

Marohn is well known and broadly respected throughout the fields of urbanism, planning, and engineering. Marohn's work is broadly cited. In 2017, Marohn was voted one of the ten "most influential urbanists of all time" by the urbanist website Planetizen. *Complaint, ¶21.* Marohn has not been a practicing engineer since 2012. *Complaint, ¶22.* Since 2012, Marohn has not signed any engineering documents, prepared any plans or

specifications requiring licensure, overseen anyone who practices engineering, worked on any engineering projects, or undertaken any professional action that created any threat to the health, safety, and welfare of the public. *Id.* Further, since 2012, Marohn has neither applied for any work as an engineer nor used his credentials to seek work as a professional engineer. The work Marohn is currently engaged in does not require any type of licensure including a professional engineering license. *Id.*

### B. Marohn's Minnesota Professional Engineering License Expires in 2018; When Marohn Becomes Aware of This, He Renews His License.

Under Minn. Stat. §326.10, professional-engineering licenses expire on June 30 in each even year. After initially obtaining a license, Minnesota licensed professional engineers must renew their professional-engineering licenses by June 30 each even year by submitting a renewal application and a $120 renewal fee. *Complaint, ¶23. See also a copy of the Board's application form attached to Complaint as Exhibit 1.* The Board issues the professional-engineering license for a period of two years. *Id.* During this two-year period, the licensed professional engineer must attend 24 hours of certified continuing education classes including at least two hours in ethics in order to renew the professional engineering license. *Id; see also* Minn. Stat. §326.107.

Before June 30, 2016, Marohn applied for renewal of his professional-engineering license, and the Board issued Marohn a two-year professional-engineering license effective July 1, 2016. *Complaint, ¶24.* Because Marohn did not receive any notice reminding Marohn to renew his license before June 30, 2018, coupled with Marohn no longer engaging in the practice of professional engineering, Marohn did not remember to renew his professional-engineering license on June 30, 2018. *Complaint,*

*¶25.*  As a result, Marohn's professional-engineering license expired on July 1, 2018. *Id.*

Marohn did not become aware that his professional-engineering license had lapsed until June 9, 2020 when another employee of Strong Towns, Michelle Erfurt, alerted Marohn that the Board's website indicated that Marohn's license was expired. *Complaint, ¶26.*  On that same day, Marohn submitted an application to reinstate his license.  *Id.*

Presumably because licensed professional engineers frequently fail to renew their professional-engineering licenses in a timely manner, the Minnesota State Legislature enacted a specific statutory provision providing for professional engineers to reinstate their licenses:

> A licensee or certificate holder whose license or certificate has expired may reinstate the expired license or certificate by satisfying all prior continuing education requirements to a maximum of 48 professional development hours, by paying all of the renewal fees due for all prior renewal periods that the license or certificate was expired and the current renewal period, and paying a delayed renewal fee in the amount set by the board.

Minn. Stat. §326.10, subd. 9; *see also Complaint, ¶27.*

Because Marohn had simply not remembered to renew his license on June 30, 2018, but otherwise believed that he had renewed his license, Marohn had completed all of the 48 continuing professional development hours for the 2016-2020 period in order to have a professional engineering license renewed.  *Complaint, ¶28.*  In addition, because Marohn would have to renew his professional-engineering license three weeks later by June 30, 2020, Marohn simultaneously submitted his renewal application for the years 2020-2022.  *Id.*  Once again, because Marohn had simply not remembered that

he had failed to renew his license on June 30, 2018, but otherwise believed that he had renewed his license, Marohn had completed all of his 24 continuing professional development hours for the 2018-2020 period as well. *Id.* In submitting his application to reinstate his professional engineering license, Marohn also paid all fees and late fees due. *Id.* As a result, the Board reinstated Marohn's professional-engineering license for 2018-2020 and issued a renewal license for 2020-2022 on or about June 19, 2020. *Id.*

From July 1, 2018 to today, Marohn has not worked as a professional engineer, has not overseen anyone working as a professional engineer, has not signed any documents or had any involvement with any project requiring licensure, and has not solicited any work or represented himself as a professional engineer in order to gain employment or practice engineering. *Complaint, ¶29.*

### C. David D. Dixon, an Engineer Residing in South Dakota, Files a Complaint Against Marohn with the Board.

On March 5, 2020, an individual named David D. Dixon filed a complaint with the Board against Marohn based exclusively on Marohn not having a license from July 1, 2018 through March 5, 2020. *Complaint, ¶30.* David D. Dixon is an engineer living in Box Elder, South Dakota. *Id.* Marohn has given talks in South Dakota on behalf of Strong Towns making arguments some professional engineers may perceive as against engineers' economic interests. *Id.*

Despite the fact that the Board had received notification of the Complaint on March 5, 2020, the Board failed to notify Marohn of the Complaint until July 24, 2020 – more than one month after the Board had renewed Marohn's professional-engineering

license. *Complaint, ¶31. See also a copy of David Dixon's complaint, together with the accompanying documents that the Board sent Marohn, attached to the Complaint as Exhibit 2.*

Dixon's complaint specifically states that it was submitted as retaliation for Marohn's political advocacy—and thus for protected First Amendment activity:

a. The complainant introduces the complaint by explaining that the complainant became interested in Marohn's licensure history as a result of reading an article Marohn authored and posted on Strong Towns website entitled "Four Ways Traffic Engineers Thwart Public Will";

b. Complainant states in the article Marohn asserted that his professional engineering license had been challenged because of his political advocacy;

c. Complainant then states he was "curious" about Marohn's assertion and, as a result, complainant undertook complainant's own investigation of Marohn's claims by investigating Marohn's licensure history on the Board's website;

d. Complainant then states that "Marohn talks about being a policy expert, the type that reads law and ordinances," and that Marohn must thus have known that describing himself as a professional engineer was illegal;

e. The complainant concludes the complaint by asking the Board "to send a clear message that frauds of this sort will not be tolerated," even though the complainant offers no evidence that Marohn realized that his license had expired;

f. The complainant never even mentioned the possibility that Marohn did not realize that his license had lapsed;

g. The Complainant failed to specify in any way that Marohn had practiced engineering without a license; and

h. Rather, the entire complaint was that Marohn had identified himself as a "professional engineer" on Strong Towns website, in publications and at speaking engagements.

*Complaint, ¶33.*

**D. Marohn Attempts to Resolve the Complaint with the Board.**

Pursuant to Minn. Stat. §326.111, the Board must establish a complaint committee to investigate complaints made to the Board ("Complaint Committee"). *Complaint, ¶34.* In their July 24, 2020 letter (Exhibit 2), the Complaint Committee requested that Marohn respond to four questions: (i) copies of documents showing positions Marohn held in Minnesota from July 1, 2018 to June 17, 2020; (ii) a listing of all Minnesota projects Marohn worked on, along with the total hours worked, from July 1, 2018 to June 17, 2020; (iii) a listing of all plans Marohn signed as a Minnesota professional engineer from July 1, 2018 to June 17, 2020; and (iv) a statement of all steps Marohn took to "rectify the matter" once he became aware that his license had expired. *Id.* The Complaint Committee's initial letter properly focused on whether Marohn had engaged in any professional-engineering services during the period where his license had lapsed. *Id.*

After receiving a copy of the complaint from the Complaint Committee, Marohn responded to the Complaint Committee's letter four days later by sending the Complaint Committee a July 28, 2020 letter. *Complaint, ¶35. See also a copy of Marohn's July 28, 2020 letter attached to the Complaint as Exhibit 3.* In his July 28, 2020 response, Marohn first confirms that he did not engage in any professional-engineering work from July 1, 2018 to June 17, 2020. *Complaint, ¶36.* Therefore, Marohn informed the Complaint Committee that there were no engineering projects he worked on or plans he signed from July 1, 2018 to June 17, 2020. *Id.*

The Complaint Committee responded to Marohn in a letter dated November 3, 2020 along with a proposed stipulation and order. *Complaint, ¶37. See also a copy of the*

*Complaint Committee's November 3, 2020 letter and proposed stipulation and order attached to the Complaint as Exhibit 4.*

In its November 3, 2020 letter and stipulation, the Complaint Committee had now shifted its focus from any professional-engineering work Marohn had performed to simply whether Marohn had referred to himself as a professional engineer in any circumstances. *Complaint, ¶38.* The Complaint Committee asserted that it had "determined" that Marohn violated Minn. Stat. §326.02, subds. 1 and 3 and Minnesota Rules 1805.0200, subps. 1(B), 2, and 4(C) and that the Complaint Committee would recommend disciplinary action by the Board. *Id.* Minn. Stat. §326.02, subd. 1 and 3 prohibit a person from providing professional-engineering services in Minnesota without a professional-engineering license. *Id.* Minn. Stat. §326.02, subd. 3 was amended in 2014 to add subd. 3(b) which states:

> (b) No person other than one licensed under sections 326.02 to 326.15 as a professional engineer may:
>
>> (1) use the term "professional engineer";
>>
>> (2) use any other abbreviation or term, including the initials "P.E." or "PE" by signature, verbal claim, sign, advertisement, letterhead, card, or similar means that would lead the public to believe that the person was a professional engineer; or
>>
>> (3) use any means or in any other way make a representation that would lead the public to believe that the person was a professional engineer.

In its November 3, 2020 letter, the Complaint Committee interpreted these provisions as prohibiting a person from referring to himself as a professional engineer to the public in any circumstances – even those unrelated to professional engineering. In other words, according to the Complaint Committee, a person would violate subdivision

3(b) if a person referred to himself as a professional engineer at a public gathering completely unrelated to providing any engineering services. *Id.* Moreover, Minnesota Rule §1800.0200 subps. 1(B), 2, and 4(C) prohibit licensees from being "[un]truthful in all professional documents;" making "a false statement or fail to disclose a material fact requested in connection with an application for certification, licensure, or renewal in this state or any other state;" or "engag[ing] in conduct involving dishonesty, fraud, deceit, or misrepresentation

As explained in the November 3, 2020 letter, the Complaint Committee proposed that Marohn sign—and agree to—the proposed stipulation and order as an alternative to the Board issuing an Order against Marohn. *Complaint, ¶39.*

In its proposed stipulation, the Complaint Committee demanded that Marohn agree that he violated Minn. Stat. §326.02, subds. 1 and 3 solely by "using the title professional engineer on his website, in publications, and in biographies for speaking engagements." *Complaint, ¶40.* Furthermore, the Complaint Committee demanded that Marohn stipulate that he violated Minnesota Rules 1805.0200, subps. 1(B), 2, and 4(C) by "engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation" when Marohn completed his reinstatement and renewal applications. *Id.* These applications required Marohn to certify:

> I have not represented myself as an architect, professional engineer, land surveyor, landscape architect, professional geologist, professional soil scientist, or certified interior designer, without proper licensure or certification, either verbally or on any printed matter, in the State of Minnesota, nor will I do so until such time as my license or certificate has been issued by the Minnesota Board of Architecture, Engineering, Land Surveying, Landscape Architecture, Geoscience and Interior Design;

*Id.*

Marohn interpreted this certification to mean that Marohn had not represented himself as a professional engineer in connection with providing, or offering to provide, professional-engineering services in Minnesota as opposed to engaging in public advocacy speech. *Complaint, ¶41.* However, the Complaint Committee asserted that Marohn would have violated this certification if he represented that he was a professional engineer *anywhere* including on the website of the non-profit corporation Marohn founded, Strong Towns. *Id.*

Finally, the stipulation specifically provided that Marohn would agree that he had made a false statement of fact on the renewal application and provided that Marohn would agree to a reprimand and censure, pay a $1,500 civil penalty, and agree to take two hours of ethics classes. *Id.*

Marohn responded to the Complaint Committee in a November 17, 2020 letter. *Complaint, ¶43; see also a copy of Marohn's November 17, 2020 letter is attached to the Complaint as Exhibit 5.* In his November 17, 2020, Marohn again acknowledged that his professional engineering license had lapsed. *Id.* However, Marohn would not agree to any stipulation finding that he engaged in any type of fraud, dishonesty, or misrepresentation based on Marohn stating that he was a professional engineer in situations which did not involve providing or offering to provide professional-engineering services. *Id.* Marohn proposed modifications to the findings of fact to show that Marohn renewed his lapsed license before being made aware of David D. Dixon's complaint. *Id.*

The Complaint Committee responded to Marohn's November 17, 2020 letter by a December 17, 2020 letter. *Complaint, ¶44; see also a copy of the Complaint Committee's December 17, 2020 letter attached to the Complaint as Exhibit 6.* Along with the December 17, 2020 letter, the Complaint Committee enclosed a revised stipulation in which the Complaint Committee increased the sanctions on Marohn by now demanding Marohn stipulate that he engaged in "conduct involving dishonesty or misrepresentation by claiming to be a licensed professional engineer while his license was expired." *Id.* Once again, the Complaint Committee demanded that Marohn agree to a reprimand and censure and a $1,500 civil penalty. *Id.*

At this point, Marohn hired an attorney, Kristine Kubes, to represent him. *Complaint, ¶45.* Ms. Kubes initially sent a December 31, 2020 letter to the Complaint Committee requesting until January 19, 2021 to respond to the Complaint Committee's December 17, 2020 letter. *Id.* On January 19, 2021, Ms. Kubes sent the Complaint Committee a January 19, 2021 letter responding to the Complaint Committee's December 17, 2020 letter. *Id.*; *see also a copy of Ms. Kubes January 19, 2021 letter attached to the Complaint as Exhibit 7.* In her letter, Ms. Kubes analyzes the issues and explains to the Complaint Committee that, under Minnesota law, Marohn did not commit any type of "fraud" or "dishonesty," which would have required Marohn to have intended to engage in the fraud or dishonesty. *Id.* Ms. Kubes's letter further cited other disciplinary actions that the Board has taken when professionals fail to timely renewal their license applications. *Id.* In those instances, the Board did not demand that the professionals stipulate that they engaged in fraud, even though those professionals were practicing in

14

their licensed profession and their actions did potentially threaten the public health safety and welfare.  *Id.*

In response to Ms. Kubes's January 19, 2021 letter, the Complaint Committee sent Ms. Kubes a February 17, 2021 letter inviting Marohn and Ms. Kubes to attend a conference before the Complaint Committee on March 10, 2021 via a remote video meeting over the internet.  *Complaint, ¶46; see also a copy of the Board's February 17, 2021 letter is attached to the Complaint as Exhibit 8.*  During this conference:

   a.   The Complaint Committee chair, Keith Rapp, stated he was concerned over reference to Marohn's engineering credentials during Marohn's public speaking appearances, specifically "Tedx, "The American Conservative", and "Talks on Google."

   b.   Paul Vogel, a member of the Complaint Committee, stated his concern that people listening to Marohn speak during his public advocacy listeners may rely more on what Marohn is advocating based on Marohn stating he is a professional engineer.

   c.   Eric Friske, a member of the Complaint Committee, questioned Marohn about how credentials are represented in a spoken podcast format.

*Id.*

At this remote conference, there were no representations or allegations of Marohn having engaged in any engineering work, or offering to engage in any engineering work, during the period Marohn's professional-engineering license had lapsed.  *Complaint, ¶47.* After the conference, the Complaint Committee sent Ms. Kubes a March 17, 2021 letter with another draft stipulation.  *Complaint, ¶48; see also a copy of the Complaint Committee's March 17, 2021 letter and proposed Stipulation attached to the Complaint as Exhibit 9.*  The updated stipulated order contained findings that omitted key facts in a way that is prejudicial to Marohn and maintains assertions that Marohn made an

"untruthful statement," a "false statement," and engaged in "conduct involving misrepresentation." *Id.*

Ms. Kubes responded to the Complaint Committee in a March 23, 2021 letter. *Complaint, ¶49; see also a copy of Ms. Kubes' March 23, 2021 letter is attached to the Complaint as Exhibit 10.* Ms. Kubes once again reiterated that Marohn would not agree to any stipulation stating that Marohn engaged in any type of dishonesty or misrepresentation. *Id.* Ms. Kubes indicated that Marohn will sign a stipulated order acknowledging the use of the term "professional engineer" in Marohn's biography during the lapse in licensure and agree to a reprimand and a $500 civil penalty if the Board will remove assertions that Marohn made an "untruthful statement," a "false statement," and engaged in "conduct involving misrepresentation" and if the Board will update the findings of fact to indicate that Marohn applied for and received renewal of his professional-engineering license prior to being notified of the complaint from David Dixon. *Id.*

The Complaint Committee responded in an April 20, 2021 letter. *Complaint, ¶50; see also, a copy of the Complaint Committee's April 20, 2021 letter attached to the Complaint as Exhibit 11.* In the April 20, 2021 letter, the Complaint Committee rejected all changes to the proposed stipulated order that were requested by Marohn. *Id.* The letter threatened that the further action against Marohn if he did not agree to sign the order. *Id.*

Because the Board, through the Complaint Committee, is continuing to threaten to discipline Marohn (i) based on Marohn referring to himself as a professional engineer

outside of providing or offering to provide professional-engineering services, and (ii)

threatening to discipline Marohn based on Marohn's public policy activities which are

counter to the economic interests of professional engineers, Marohn has commenced this

action against the Board and its members in their official capacity for violation of

Marohn's civil rights under 42 U.S.C. §1983.  *Complaint, ¶51.*

## ARGUMENT

### A.  Introduction.

The Board has moved to dismiss Marohn's Complaint under the *Younger*

abstention doctrine.  *Younger v. Harris*, 401 U.S. 37 (1971).  The Board argues under the

second requirement for application of *Younger* that its disciplinary proceeding against

Marohn implicates the State's important interest in "in regulating the professional

conduct of its licensees and the titles they use."  However, the State does not have an

important interest in regulating "titles used" in political advocacy.  In fact, such an

interest directly violates the First Amendment.  Moreover, the Boards claims against

Marohn fit within two recognized exceptions to *Younger.*  First, Minn. Stat. §326.02,

subd. 3(b) is "patently unconstitutional" both facially and as applied under *NIFLA. Cent.*

*Ave. News, Inc. v. City of Minot, N. D.*, 651 F.2d 565, 570 (8th Cir. 1981) (citing *Doe v.*

*Bolton*, 410 U.S. 179 (1973) and *Zwickler v. Koota*, 389 U.S. 241 (1967)).  Second, the

Board's initiation of disciplinary proceedings against Marohn was undertaken in bad faith

as demonstrated by the Complaint Committee member Paul Vogel's comments at the

remote conference stating "people listening to Marohn speak during his public advocacy

listeners may rely more on what Marohn is advocating based on Marohn stating he is a

professional engineer."

As a result, this memorandum will first address the merits of Marohn's First Amendment claims before addressing the Board's arguments under the *Younger* doctrine. The restriction on the use of the title "professional engineer" in any circumstances is facially overbroad and, as applied to Marohn's political speech, cannot survive strict scrutiny under *NIFLA*.  The restriction is so "patently unconstitutional" that this Court should exercise its jurisdiction to protect Marohn's federally guaranteed right to free speech.

**B.  Standard of Review on a Motion to Dismiss Under Rule 12(b)(6).**

In considering a Motion to Dismiss under Rule 12(b)(6), the Court is to accept as true all of the factual allegations of the Complaint and to review those allegations in a light most favorable to the nonmoving party—here Marohn.  *Anderson v. Franklin County, Mo.*, 192 F.3d 1125, 1131 (8th Cir. 1999); *Riley v. St. Louis County, Mo.*, 153 F.3d 627, 630 (8th Cir. 1998); *Springdale Educ. Ass'n v. Springdale School Dist.*, 133 F.3d 649, 651 (8th Cir. 1998).

**C.  Minn. Stat. §326.02, Subd. 3(b), As Applied to Marohn, Violates the First Amendment's Prohibition on Content-Based Speech Restrictions.**

**1.  Minn. Stat. §326.02, Subd. 3(b)'s Prohibition on Using the Term "Professional Engineer" Is a Content-Based Speech Restriction and Is Thus Subject to Strict Scrutiny.**

Content-based speech regulations—laws that "'target speech based on its communicative content'"—are subject to strict scrutiny. *NIFLA*, 138 S.Ct. 2361, 2371 (2018) (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)). A speech regulation is content-based if the "law applies to particular speech because of the topic discussed or

18

the idea or message expressed." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).

Laws that are subject to strict scrutiny are "presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Id*. Narrow tailoring is a demanding standard:

> A narrowly tailored regulation is one that actually advances the state's interest (is necessary), does not sweep too broadly (is not overinclusive), does not leave significant influences bearing on the interest unregulated (is not underinclusive), and could be replaced by no other regulation that could advance the interest as well with less infringement of speech (is the least-restrictive alternative).

*281 Care Committee v. Arneson*, 766 F.3d 774, 787 (8th Cir. 2014) (quoting *Republican Party of Minnesota v. White*, 416 F.3d 738, 751 (8th Cir. 2005) (en banc)).

In *NIFLA*, the Supreme Court held that "professional speech" is not an exception to the First Amendment free speech guarantee. 138 S.Ct. at 2371-75. The Court affirmed that "[s]peech is not unprotected merely because it is uttered by 'professionals'" and explained why professional speech is not an exception to the rule subjecting content-based restrictions to strict scrutiny. *Id*. at 2371-72.

Before *NIFLA*, two courts had struck down under the First Amendment state restrictions on the use of professional titles. *Serafine v. Branaman*, 810 F.3d 354, 357-62 (5th Cir. 2016) (holding unconstitutional, as applied, a provision of a psychologist-licensing scheme that restricted the use of the title "psychologist" by unlicensed persons); *Järlström v. Aldridge*, 366 F.Supp.3d 1205 (D. Ore. 2018) (holding unconstitutionally overbroad and thus facially unconstitutional a provision of an engineer-licensing scheme that restricted the use of the title "engineer" by unlicensed persons).

The only interests in its enforcement action that the Board identifies are

"regulating the professional conduct of its licensees and the titles they use." *Defs.'*
*Mem. Supp. Dismissal* 7. But the Board nowhere explains how Marohn's use of the title
"professional engineer" constitutes "professional conduct." And the undisputed facts
show that his use of the title was not "professional conduct": Marohn made the
statements labeling himself a "professional engineer" outside of practicing engineering
or soliciting work as an engineer. *Compl.* ¶ 29. In fact, he made them in the course of
political speech.  Moreover, the statements were themselves speech—specifically, fully
protected political speech—and not conduct.

Minnesota does not have an important interest—or even a legitimate interest—in
controlling Marohn's political speech regardless of whether he holds a Minnesota
professional license. First Amendment caselaw has long protected a licensed
professional's speech outside of the practice of the licensed profession, and the
Supreme Court has recently held that, outside of narrow exceptions, the First
Amendment fully protects speech uttered in practicing a licensed profession as well.
*NIFLA*, 138 S.Ct. at 2371-75.

To understand just how strongly protected speech by licensed professionals is after
*NIFLA* requires examining the pre- *NIFLA* state of First Amendment caselaw. In an
influential concurrence in *Lowe v. S.E.C.*, 472 U.S. 181, 232 (1985), Justice Byron White
urged a distinction between speech that a licensed professional utters as a professional,
i.e., in the course of providing client-tailored advice, and the licensed professional's other
speech, such as political advocacy. According to Justice White's approach, the former
received little or no First Amendment protection, whereas the latter was as fully protected

as a non-professional's speech:

> Where the personal nexus between the professional and client does not exist, and a speaker does not purport to be exercising judgment on behalf of any particular individual with those circumstances he is directly acquainted, government regulation ceases to function as legitimate regulation of professional practice with only incidental impact on speech; it becomes regulation of speaking or publishing as such, subject to the First Amendment's command that "Congress shall make no law … abridging the freedom of speech, or of the press."

*Id*.

Based on Justice White's concurrence, several circuit courts developed the "professional speech doctrine" holding that states could not regulate the speech of professionals, except when the professional is engaged in professional conduct. *Wollschlaeger v. Governor of Florida,* 848 F.3d 1293, 1310 (11th Cir. 2017) (*en banc*); *King v. Governor of New Jersey*, 767 F.3d 216, 232 (3d Cir. 2014) ("when a professional is speaking to the public at large or offering her personal opinion to a client, her speech remains entitled to the full scope of protection afforded by the First Amendment"); *Pickup v. Brown*, 740 F.3d 1208, 1227 (9th Cir. 2014) ("where a professional is engaged in a public dialogue, First Amendment protection is at its greatest"); *Moore–King v. County of Chesterfield*, 708 F.3d 560, 569 (4th Cir. 2013) ("the relevant inquiry to determine whether to apply the professional speech doctrine is whether the speaker is providing personalized advice in a private setting to a paying client or instead engages in public discussion and commentary").

In *NIFLA*, the Supreme Court rejected the "professional speech" doctrine and abrogated these circuit-court cases on the ground that they wrongly applied ***diminished*** protection to a professional's speech *within the professional-client relationship*.  138

S.Ct. at 2371-75. In other words, *NIFLA* held that a professional's speech was entitled to full First Amendment protection even when the professional was engaged in professional conduct and subjected any content-based restriction, such as those contained in Minn. Stat. §326.02 subd. 3(b), to strict scrutiny.

The cases on which the Board relies are readily distinguishable from Marohn's case in that they involve conduct or speech by a licensee in the course of engaging in a licensed profession. *Middlesex Cty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 427-28 (1982); *Amanatullah v. Colorado Bd. of Med. Examiners*, 187 F.3d 1160, 1162 (10th Cir. 1999). And the Board does not dispute Marohn's claim that he was not working as an engineer when he made the statements that the Board's complaint committee is complaining about. *Compl*. ¶ 29. Marohn's speech was thus fully protected even before *NIFLA*.

The Board's interest in regulating the titles that state licensees use is thus patently unconstitutional as applied to Marohn. First, the alleged existence of that interest is, strictly speaking, nonsensical here because the Board's contention is that Marohn used the title "professional engineer" *when he was not licensed or even working as an engineer*. *Defs.' Mem. Supp. Dismissal* 2. More importantly, although the state has an important interest in regulating the use of professional titles in attempts to solicit business or in actually practicing a regulated profession, the state does not have an important interest—or even a legitimate interest—in controlling the use of titles in other contexts.

### 2. The Board's Claim that Marohn "Lied" on his Reinstatement Application is Prohibited Under *United States v. Alvarez*, 567 U.S. 709, 716-22, 724 (2012).

The Board also claims that Marohn engaged in professional misconduct because Marohn signed a statement to the Board that he had not "represented" himself "as a professional engineer" when he was unlicensed. However, similarly to the Board's efforts to regulate Marohn's use of the term "professional engineer," the Board also may not regulate Marohn's statement on his reinstatement application that he had not used the term "professional engineer" while unlicensed.

First, in *United States v. Alvarez*, 567 U.S. 709 (2012), the Supreme Court held that false speech—even knowingly false speech—is generally protected and subject to strict scrutiny outside narrow exceptions such as defamation and commercial fraud. In *Alvarez*, the Supreme Court struck down the Stolen Valor Act, a law prohibiting falsely claiming to have won a military decoration. *Id.* at 716, 730. The person challenging the law, a candidate for public office, had been convicted of falsely claiming during a political campaign to have won the Congressional Medal of Honor. *Id.* at 713-14. The defendant did not deny that he flat-out lied about having won the medal. *Id.* at 714, 715. Nonetheless, the Court reversed his conviction and struck down the law as a content-based speech restriction. *See id.* at 716-18, 722, 729-30. *Alvarez* refused to recognize a new exception to the application of strict scrutiny and affirmed that, outside of narrow exceptions such as fraud and defamation, a prohibition on speech because of its falsity is just another content-based speech restriction subject to strict scrutiny:

> Absent from those few categories where the law allows content-based regulation of speech is any general exception to the First Amendment for false statements.

This comports with the common understanding that some false statements are inevitable if there is to be an open and vigorous expression of views in public and private conversation, expression the First Amendment seeks to guarantee.

*Id*. at 718. The Eight Circuit, relying on *Alvarez*, held that strict scrutiny applies to prohibitions on false *political* speech. *281 Care Comm.*, 766 F.3d at 784.

As set forth above, before *NIFLA,* circuit courts had held that professional licensing boards may only regulate a professional's speech when the professional is engaged in offering to provide or providing the professional services the licensing board seeks to regulate. *King v. Governor of New Jersey*, 767 F.3d 216, 232 (3d Cir. 2014); *Moore–King v. County of Chesterfield*, 708 F.3d 560, 569 (4th Cir. 2013); *Wollschlaeger v. Governor, Florida*, 848 F.3d 1293 (11th Cir. 2017).

If the representation on the reinstatement application had asked whether Marohn had described himself as a "professional engineer" while engaging or offering to engage in providing engineering services while unlicensed, the Board may have an argument that it has an important or compelling state interest in sanctioning Marohn for that false statement.  However, if the Board has no interest in prohibiting individuals from using the term "professional engineer" to describe themselves when not engaging or offering to engage in providing engineering services while unlicensed.  The Board likewise does not have an interest in compelling Marohn to represent in a reinstatement application that he did not describe himself as a professional engineer in any circumstances, including those not connected to engaging or offering to engage in providing engineering services while unlicensed.

As explained above, Marohn signed the representation because he believed –

correctly – that the Board could only regulate his speech when Marohn was engaged in providing or offering to provide engineering services while unlicensed. As a result, the Board's efforts to discipline Marohn based on his representation fails under *NIFLA* and *Alvarez*.

### 3. Rather Than Cite *NIFLA*, The Board Exclusively Relied on Commercial-Speech Cases Even Though Marohn's Speech Was Political, Not Commercial.

The Supreme Court has made an exception to strict scrutiny for content-based restrictions on commercial speech, but the exception is narrow: for purposes of the exception, what "defines commercial speech"—and that thus distinguishes it from fully protected speech—is that it is speech that "*proposes* a commercial transaction." *Bd. of Trustees of State Univ. of New York v. Fox*, 492 U.S. 469, 482 (1989) (citing *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 761 (1976)). The Board apparently knows this because it anticipates that Marohn will rely on its narrowness to show that his speech was not commercial, *see Defs.' Mem. Supp. Dismissal* 10, and because the Board characterizes the doctrine in a way that is carefully calculated to mislead this Court about the doctrine's scope:

> Marohn appears to be indirectly suggesting that his speech is not commercial speech. But the Supreme Court has been clear that concrete offers to perform services are not required to make speech commercial speech. Instead, the Court has applied a commercial-speech analysis to questions such as whether businesses can use particular names—despite the fact that there is no specific "offer" inherent in the name alone—and to advertisements promoting the use of a product—despite there being no particular offer with respect to the product.

*Id*. (citing *Friedman v. Rogers*, 440 U.S. 1, 12 (1979) and *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 558-59 (1980)).

This is so evasive as to be mendacious. As explained above, the commercial speech doctrine applies to only "'speech proposing a commercial transaction.'" *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 562 (1980) (quoting *Ohralik v. Ohio State Bar Assn.*, 436 U.S. 447, 455-56 (1978)). The Supreme Court might not have limited the doctrine to "concrete offers" that constitute an offer in the law-school offer-and-acceptance sense, but the Court has limited the doctrine to speech advertising or marketing a good or service. *E.g.*, *Fox*, 492 U.S. at 482; *Cent. Hudson*, 447 U.S. at 562. Indeed, the term "commercial speech" is something of a misnomer: the doctrine is really an advertising-speech or marketing-speech doctrine. *See, e.g.*, *Fox*, 492 U.S. at 482; *Cent. Hudson*, 447 U.S. at 562; *Seabolt v. Texas Bd. of Chiropractic Examiners*, 30 F. Supp. 2d 965, 967 (S.D. Tex. 1998) (characterizing *Central Hudson* as "announc[ing] a four-part framework for analyzing *advertising restrictions* under the First Amendment" (emphasis added)).

And the cases on which the Board relies include no counterexample. The Board relies heavily on *Friedman v. Rogers*, 440 U.S. 1 (1979) for the proposition that a state may regulate the use of a tradename, *Defs.' Mem. Supp. Dismissal* 11, 12, 13, but *Friedman* involved the use of a tradename to promote an optometry practice (and thus a business), not the use of a professional title in political speech. 440 U.S. at 3-6, 8, 11, n.10. Indeed, the *Friedman* Court itself used the proposes-a-business-transaction test to determine that use of a tradename was commercial speech and thus entitled to reduced First Amendment protection: "the trade name is used as part of a proposal of a commercial transaction." *Id.* at 11; *see also id.* at 11 n.10 (distinguishing an

advertisement that "'did more than simply propose a commercial transaction'" (quoting *Bigelow v. Virginia*, 421 U.S. 809, 822 (1975)), from "the mere solicitation of patronage implicit in a trade name"). The Board's extensive discussion of *Friedman* without acknowledgment of the test that *Friedman* actually used is, to put things mildly, less than entirely forthright.

Likewise, the other tradename and professional-title cases that the Board relies on all involve the use of a tradename or title to promote a business and are thus irrelevant. *Defs.' Mem. Supp. Dismissal* 11-12.

Instead of *Friedman*, this Court should rely on *Serafine*. In *Serafine*, the plaintiff had been a candidate for office who "described herself as a 'psychologist' on her campaign website." 810 F.3d at 357. The Texas State Board of Examiners of Psychologists ordered to her to stop describing herself as a "psychologist" and to stop "offering or providing psychological services" because she was not a licensed psychologist. *Id*. The plaintiff sued in federal court to challenge the provisions that she was ordered to comply with. *Id*. The Fifth Circuit held that the prohibition on using the title "psychologist" without being licensed was unconstitutional as applied to the plaintiff because she used it in political speech, not commercial speech. *Id*. at 360-62. Minnesota's restriction on the use of the title "professional engineer" is, for the same reason, unconstitutional as applied to Marohn.

Outside of advertising or marketing, the commercial-speech doctrine does not control—*Alvarez* controls, allowing people to tell big whopping lies about their credentials. And because the false speech in *Alvarez* was protected, Marohn's speech is

protected a fortiori. Unlike the defendant in *Alvarez*, Marohn did not knowingly misrepresent his credentials, but was just honestly mistaken. Marohn had been licensed as a professional engineer and did not realize that his license had lapsed because of a failure to renew it.  This honest mistake was a far cry from lying about having won the Medal of Honor in *Alvarez*, and even that lie was protected.

The Board does not even assert that Marohn characterized himself as a "professional engineer" in an attempt to market his services as a professional engineer, or, indeed, to market *anything*. The Board thus fails to present even a colorable argument that Marohn's speech was commercial.

Minnesota Statutes §326.02, subd. 3(b), the provision that Marohn is accused of violating, is a content-based speech restriction because, on its face, it limits what a person is allowed to say; indeed, the paragraph explicitly limits what words a person may use to describe themselves:

> (b) *No person other than one licensed under sections 326.02 to 326.15 as a professional engineer may*:
>
> (1) *use the term "professional engineer"*;
>
> (2) *use any other abbreviation or term, including the initials "P.E." or "PE"* by signature, verbal claim, sign, advertisement, letterhead, card, or similar means *that would lead the public to believe that the person was a professional engineer*; or
>
> (3) use any means or in any other way make a representation that would lead the public to believe that the person was a professional engineer.

Minn. Stat. §326.02, subd. 3(b) (emphasis added). Courts have already recognized that restrictions on the use of professional titles are content-based speech restrictions. *See, e.g.*, *Serafine*, 810 F.3d at 357-60 (Texas's prohibition on the unlicensed use of the title

28

"psychologist" was, as applied to political speech, subject to strict scrutiny); *Järlström*, 366 F.Supp.3d at 1217-18 (provisions of Oregon law restricting the use of the titles "engineer," "professional engineer," and "registered professional engineer" were content-based speech restrictions under *Reed*, 576 U.S. at 163). In fact, the engineering title laws that were stuck down as unconstitutionally overbroad in *Järlström* were virtually identical to Minn. Stat. §326.02, subd. 3(b). 366 F.Supp.3d at 1215.

When Marohn made the statements characterizing himself as a professional engineer, he did so outside of any effort to market or perform his engineering services— indeed, he made them in the course of political advocacy. The statements were thus fully protected. *See, e.g.*, *Serafine*, 810 F.3d at 360 (use of a professional title in political speech is fully protected by the First Amendment); *281 Care Comm.*, 766 F.3d at 784 (false political speech is fully protected). As applied to Marohn's speech, therefore, §326.02, subd. 3(b) is subject to strict scrutiny and is unconstitutional.

4. **Minn. Stat. §326.02, Subd. 3(b)'s Prohibition on Using the Term "Professional Engineer" Either (i) Fails Strict Scrutiny for Lack of a Compelling State Interest if Applied to Political Speech, or (ii) Is Facially Overbroad Because it Would Prohibit Persons From Referring to Themselves as a Professional Engineer in Social Settings.**

The Board is on the horns of a dilemma in this case. On the one hand, the Board is seeking to apply Minn. Stat. §326.02, subd. 3(b) to political speech for which the Board cannot assert an important or compelling state interest. On the other hand, if the Board asserts that Minn. Stat. §326.02, subd. 3(b) applies in all circumstances – which by its terms it plainly does – the provision is facially overbroad. The Board does not even pretend that Minn. Stat. §326.02, subd. 3(b)'s prohibition on using the term "professional

engineer," as applied to Marohn, passes strict scrutiny. The only purpose to the

prohibition that the Board identifies is to prevent deceiving the public about one's

qualifications. *Defs.' Mem. Supp. Dismissal* 10. But that can only be a compelling

purpose where the title is used to solicit business as an engineer. Outside of commercial

speech, a person may, under *Alvarez*, lie through one's teeth about one's qualifications.

Furthermore, the restriction is not narrowly tailored because it is not limited to attempts

to solicit business as an engineer.

In addition, Minn. Stat. §326.02, subd. 3(b) is facially overbroad:

> In the First Amendment context, however, we have recognized "a second type of
> facial challenge, whereby a law may be invalidated as overbroad if a substantial
> number of its applications are unconstitutional, judged in relation to the statute's
> plainly legitimate sweep." *United States* v. *Stevens*, 559 U. S. 460, 473 (2010)
> (internal quotation marks omitted).

*Americans for Prosperity Found. Bonta Thomas More Law Ctr. v. Bonta*, No. 19-251,

2021 WL 2690268, at *11 (U.S. July 1, 2021). "An ordinance prohibiting a broad range

of protected expression may be facially challenged as overbroad." *Ways v. City of

Lincoln, Neb.*, 274 F.3d 514, 518 (8th Cir. 2001).  One Court has applied the overbreadth

doctrine to a regulation prohibiting the use of the term "engineer." *Järlström*, 366 F.

Supp. 3d at 1222.  Courts have declined to abstain under *Younger* based on a state's

efforts to enforce a substantially overbroad ordinance. *Tolbert v. City of Memphis, Tenn.*,

568 F. Supp. 1285, 1289 (W.D. Tenn. 1983).

Minn. Stat. §326.02, subd. 3(b) is unconstitutionally overbroad.  It prohibits

anyone in Minnesota from describing themselves as a professional engineer at all times

and in all places – including social settings and political speech unconnected to

engaging the practice of engineering.  In fact, here, the Board is attempting to prohibit a person from describing himself as a professional engineer when engaged in political advocacy.  As a result, Minn. Stat. §326.02, subd. 3(b) is facially overbroad and "patently unconstitutional."

### 5.  To Summarize, The Board's Claims Against Marohn Are Prohibited Under the First Amendment.

Finally, to summarize, under *NIFLA*, the Board does not have an interest in regulating the conduct of professional engineers when not either engaging or offering to engage in providing engineering services while unlicensed.  In fact, why would the Board have such an interest?  Here, the Board's *sole* interest is in ensuring that individuals engaged providing engineering services in Minnesota are properly trained to perform engineering services to ensure that structures constructed in Minnesota are properly constructed.  Marohn has not provided or offered to provide engineering services in Minnesota since 2012.  Rather, Marohn has engaged in political advocacy that will positively impact taxpayers and negatively impact professional engineers.  The Board has no interest in regulating such advocacy and, in fact, is prohibited from regulating such advocacy under the First Amendment.  Despite this, the Board is going after Marohn based exclusively on Marohn describing himself as a professional engineer when engaged in such political advocacy and making a representation regarding Marohn's use of the term "professional engineer" when engaged in such advocacy. The Board's efforts to discipline Marohn violate the first Amendment under *NIFLA* and *Alvarez.*

**D. The *Younger* Doctrine Does Not Apply Because (i) This Federal Action Does Not Threaten Significant State Interests, (ii) Minn. Stat. §326.02, Subd. 3(b)'s Prohibition on Unlicensed Persons Stating that They Are "Professional Engineers Is "Patently Unconstitutional," and (iii) the Board's Actions Against Marohn Are in Bad Faith.**

**1. The *Younger* Abstention Doctrine.**

In *Younger v. Harris*, 401 U.S. 37 (1971), the Supreme Court held that federal courts must abstain from exercising jurisdiction over federal lawsuits that seek to enjoin pending state criminal proceedings. The Supreme Court subsequently extended *Younger* to pending state civil actions and pending state administrative proceedings. *Huffman v. Pursue, Ltd.*, 420 U.S. 592 (1975); *Middlesex County Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423 (1982).

The Supreme Court has "stressed" that "the circumstances fitting within the *Younger* doctrine" are "exceptional." *Sprint Communications, Inc. v. Jacobs*, 571 U.S. 69, 73 (2013). "The various types of abstention are not rigid pigeonholes into which federal courts must try to fit cases." *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 11 n.9 (1987). In the analogous *Pullman* context – another species of abstention – the Court has acknowledged that abstention is "generally inappropriate when [F]irst [A]mendment rights are at stake." *Chula Vista Citizens for Jobs & Fair Competition v. Norris*, 782 F.3d 520, 528 (9th Cir. 2015) (alteration in original; citation omitted). That is because forcing a plaintiff into a state court proceeding "might itself effect the impermissible chilling of the very constitutional right he seeks to protect." *City of Houston v. Hill*, 482 U.S. 451, 467-68 (1987) (citation omitted).

As a result, the Supreme Court has held that "the pendency of an action in [a] state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction." *Id.* (quoting *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 817 (1976).

In order for *Younger* to apply, the Board has the burden of satisfying each of the following three conditions:

> *Younger* abstention is appropriate when (1) the federal action would disrupt an ongoing state judicial proceeding (2) which implicates important state interests and (3) which provides an adequate opportunity to raise constitutional challenges. *Middlesex County Ethics Comm. v. Garden State Bar Ass'n,* 457 U.S. 423, 432, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982).

*Cormack v. Settle-Beshears*, 474 F.3d 528, 532 (8th Cir. 2007).

In addition:

> [e]ven if these three requirements are met, a federal court should not abstain if there is a showing of 'bad faith, harassment, or some other extraordinary circumstance that would make abstention inappropriate." *Middlesex County Ethics Comm. v. Garden State Bar Ass'n,* 457 U.S. 423, 435. The Supreme Court has suggested that an exception making abstention inappropriate might exist where a state statute is "flagrantly and patently violative of express constitutional prohibitions in every clause, sentence and paragraph, and in whatever manner and against whomever an effort might be made to apply it." *Trainor v. Hernandez,* 431 U.S. 434, 447, 97 S.Ct. 1911, 52 L.Ed.2d 486 (1977) (quoting *Younger,* 401 U.S. at 53–54, 91 S.Ct. 746).

*Plouffe v. Ligon*, 606 F.3d 890, 892–93 (8th Cir. 2010).

Finally, as the Eighth Circuit has held:

> Despite the concerns underlying the *Younger* abstention principle, however, in certain cases the duty of the federal courts to vindicate and protect federal rights must prevail over the policy against federal court interference with state criminal proceedings.

*Lewellen v. Raff*, 843 F.2d 1103, 1109 (8th Cir. 1988).

The Supreme Court has never "suggested that *Younger* requires abstention in deference to a state judicial proceeding reviewing legislative or executive action. Such a broad abstention requirement would make a mockery of the rule that only exceptional circumstances justify a federal court's refusal to decide a case in deference to the States." *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 368, 109 S. Ct. 2506, 2518 (1989) (citing *Moore*, 442 U.S. at 423 n. 8 ("we do not remotely suggest 'that every pending proceeding between a State and a federal plaintiff justifies abstention unless one of the exceptions to *Younger* applies'")) (other citation omitted). In fact, as the Seventh Circuit recently recognized, "*Younger* suggests that abstention may be inappropriate if the very existence of a state proceeding violates the First Amendment." *Milchtein v. Chisholm*, 880 F.3d 895, 899 (7th Cir. 2018).

As explained below, *Younger* abstention does not apply in this case because the Board cannot satisfy the second *Younger* factor – i.e., the Board's action does not implicate "important state interests" – and even if the Board could satisfy the second factor, the Board is proceeding in bad faith and the statute is "patently unconstitutional."

### 2. The State Does Not Have an "Important State Interest" in Regulating the Speech of "Professional Engineers" When Such Speech Is Not Connected to the Practice of Engineering and Is in Fact Political Speech.

As the Board correctly states, *Younger* abstention does not apply unless the state proceeding "'implicates important state interests.'" *Defs.' Mem. Supp. Dismissal* 5 (quoting *Plouffe v. Ligon*, 606 F.3d 890, 892 (8th Cir. 2010)). And the burden is on the state to show that this condition applies. *Philip Morris, Inc. v. Blumenthal*, 123 F.3d 103, 106 (2d Cir. 1997) (citing *Trainor v. Hernandez,* 431 U.S. 434, 448 (1977) (Blackmun,

J., concurring)). But the Board's attempt to enforce Minn. Stat. §326.02, subd. 3(b)'s prohibition on using the term "professional engineer" against Marohn does not implicate any legitimate state interest, let alone an important one.

At page 7 of its Memorandum, the Board identifies its "important state interest" as follows:

> The State of Minnesota has a vitally important interest in regulating the professional conduct of its licensees and the titles they use. *See Middlesex*, 457 U.S. at 434 (recognizing state had "an extremely important interest in maintaining and assuring the professional conduct of the attorneys it licenses."); *Amanatullah v. Colo. Bd. of Med. Exam'rs*, 187 F.3d 1160, 1164–65 (10th Cir. 1999) (recognizing states' traditional role in regulating professions and states' strong state interest in licensing and discipline to protect the public). Here, the committee alleges that Marohn falsely held himself out as a professional engineer licensed by the Board for almost two years and then provided false certifications to the Board when he finally renewed his license. The improper use of professional credentials and false representations to a state regulator upon renewing a license are important state interests.

The Second Circuit analyzed the issue of what constitutes an important state interest under *Younger* in *Philip Morris, Inc. v. Blumenthal*, 123 F.3d 103, 106 (2d Cir. 1997). In *Philip Morris*, the State of Connecticut, by its Attorney General Richard Blumenthal, commenced an against action tobacco manufacturer Philip Morris, Inc. seeking damages under Connecticut's anti-trust laws, Deceptive Trade Practices Act, and Connecticut common law based on tobacco's negative health effects. With respect to damages, Connecticut was seeking recoupment of state Medicaid payments made to treat smoking-related illness. Philip Morris, Inc. commenced a federal action seeking to enjoin the state court lawsuit. The District Court dismissed the federal action under *Younger*. On appeal, the Second Circuit reversed with respect to Connecticut's damage claim, finding that the state's interest in recovering damages is not a significant state

35

interest under *Younger*. While Connecticut argued that its action against Philip Morris was to eradicate unfair trade practices or anticompetitive business practices, *Philip Morris* found that Connecticut's action had "little to do with eradicating unfair trade practices or anticompetitive business practices." *Id*. at 106.

As set forth above, the Board has the burden on its motion in identifying its significant state interest. The only important state interest the Board identifies is "regulating the professional conduct of its licensees and the titles they use." *Defs.' Mem. Supp. Dismissal* 7. Similarly to *Philip Morris*, the Board's action against Marohn has "little to do" with the professional conduct of engineers because Marohn never described himself as an engineer while engaging or offering to engage in providing engineering services. The undisputed facts show that Marohn identified himself as a "professional engineer" outside of practicing engineering or soliciting work as an engineer. *Compl*. ¶ 29. In fact, Marohn made these statements as part of direct political advocacy. Moreover, the statements were themselves speech—specifically, fully protected political speech—and not conduct.

The cases on which the Board relies are readily distinguishable in that they involve conduct or speech by a licensee in the course of engaging in a licensed profession. *Middlesex Cty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 427-28 (1982); *Amanatullah v. Colorado Bd. of Med. Examiners*, 187 F.3d 1160, 1162 (10th Cir. 1999). Here, the Board does not dispute Marohn's claim that he was not working as an engineer when he made the statements that the Board's complaint committee is complaining about. *Compl*. ¶ 29.

The state's interest in regulating the titles that state licensees use when not engaged in the profession, *Defs.' Mem. Supp. Dismissal* 7, does not deserve to be taken any more seriously. First of all, the alleged existence of that interest is, strictly speaking, nonsensical here because the Board's contention is that Marohn used the title "professional engineer" *when he was not licensed and not practicing engineering*. *Id.* at 2. More importantly, although the state may have important interest in regulating the use of professional titles in attempts to solicit business or in actually practicing a regulated profession, the state does not have an important interest—or even a legitimate interest—in controlling the use of titles in other contexts.

Under *Alvarez*, people are, outside of narrow exceptions not relevant here, allowed to confer on themselves whatever titles they care to make up. You can even claim to be a recipient of the Medal of Honor even if you are not—which is exactly what the defendant in *Alvarez* did. And again: the Board does not even assert that Marohn claimed to be a "professional engineer" while working as an engineer or attempting to obtain work as an engineer. Thus the interest that the state is actually attempting to vindicate here is not the permissible regulation of a professional title's use, but the unconstitutional suppression of Marohn's fully protected speech. And that is not even a legitimate interest, let alone one that calls for *Younger* abstention.

**3.** ***Younger* Abstention Does Not Apply Because Minn. Stat. §326.02, Subd. 3(b)'s Prohibition on Using the Term "Professional Engineer" Is "Patently Unconstitutional."**

As set forth above, even if the Board satisfies the second *Younger* factor, *Younger* does not require abstention if "the plaintiff establishes that [a state law being challenged

is] patently and flagrantly unconstitutional." *Cent. Ave. News, Inc. v. City of Minot, N. D.*, 651 F.2d 565, 570 (8th Cir. 1981) (citing *Doe v. Bolton*, 410 U.S. 179 (1973) and *Zwickler v. Koota*, 389 U.S. 241 (1967)).  For the reasons given above, Minn. Stat. §326.02, subd. 3(b)'s prohibition on using the term "professional engineer," as applied to Marohn, is patently unconstitutional. Moreover, as set forth above, Minn. Stat. §326.02, subd. 3(b) is facially overbroad.  The Tenth Circuit recognized in *Phelps v. Hamilton*, 59 F.3d 1058, 1069–70 (10th Cir. 1995) that a facial overbreadth challenge to a statute under the First Amendment free speech guarantee supports declining to abstain under *Younger.*

The Board does even pretend that Marohn called himself a "professional engineer" in an attempt to solicit engineering services—so strict scrutiny applies. And the Board does not even pretend that the challenged restriction, as applied to Marohn, passes strict scrutiny (something that the Board has the burden of showing). In these circumstances, "it is the duty of the federal court to exercise its jurisdiction." *Cent. Ave. News*, 651 F.2d at 570 (citing *Harman v. Forssenius*, 380 U.S. 528 (1965)).

Likewise, as the Board itself concedes, *Younger* does not apply where a plaintiff shows that a state official pursues an enforcement action "without hope of obtaining a valid conviction." *Defs.' Mem. Supp. Dismissal* 6 (quoting *Perez v. Ledesma*, 401 U.S. 82, 85 (1971) and citing *Postscript Enterprises, Inc. v. Peach*, 878 F.2d 1114, 1116 (8th Cir. 1989)). Here, *Alvarez* is an insurmountable obstacle to the Board prevailing in state court. Again: under *Alvarez*, Marohn wins a fortiori because the misstatement of fact that serve as the basis for the Board's action are trivial compared the whopper told by the

defendant in *Alvarez.*

### 4. *Younger* Abstention Does Not Apply Because the Board's Enforcement Action Against Marohn Is in Bad Faith.

In *Lewellen v. Raff*, 843 F.2d 1103, 1109-10 (8th Cir. 1988), the Eighth Circuit

underscored that "[b]ad faith and harassing prosecutions also encompass those

prosecutions that are initiated to retaliate for or discourage the exercise of constitutional

rights." *Id*. at 1109-10; *see also Wilson v. Thompson*, 593 F.2d 1375, 1383 (5th Cir.

1979) ("When a significant chilling effect on free speech is created by a bad faith

prosecution, the prosecution will thus as a matter of law cause irreparable injury

regardless of its outcome, and the federal courts cannot abstain from issuing an

injunction.").

> Although Texas disciplinary proceedings are capable of deciding constitutional challenges to specific procedures, recourse in those proceedings is not a sufficient avenue to remedy the constitutional injury done by bad faith proceedings themselves. The right under *Shaw* is to be free of bad faith charges and proceedings, not to endure them until their speciousness is eventually recognized. *Shaw,* 467 F.2d at 122 n. 11. *See Younger,* 401 U.S. at 46, 91 S.Ct. at 751; *id.* at 56, 91 S.Ct. at 757 (Stewart, J. concurring); *Wilson,* 593 F.2d at 1382–83. Thus, *Younger* forbade the district court from interfering with Bishop's disciplinary proceedings on the ground of specific constitutional flaws in the procedure followed in the state system. It did not foreclose injunctive relief based on Bishop's allegations of bad faith.

*Bishop v. State Bar of Texas*, 736 F.2d 292, 294 (5th Cir. 1984).

*Lewellen* is directly relevant.  In *Lewellen*, plaintiff Lewellen was an African

American attorney representing a defendant in a criminal case.  During the trial, the state

claimed it had evidence Lewellen had bribed a witness.  The judge in the criminal trial

referred Lewellen to the lawyers ethics board for discipline and the county attorney

charged Lewellen with witness bribery.  While criminal case against Lewellen was

pending, Lewellen filed a federal action to enjoin the state criminal case.  The state filed a

motion to dismiss under *Younger* and the district court held a six-day hearing to

determine whether the prosecution of Lewellen was conducted because (i) Lewellen was

an African American, and (ii) Lewellen was running for public office against the County

Sheriff.  The District Court found that the state was prosecuting Lewellen because (i)

Lewellen was an African American, and (ii) Lewellen was running for public office

against the County Sheriff and, as a result, denied the state's motion to abstain under

*Younger* and the Eighth Circuit affirmed in *Lewellen.*  In order to establish such bad faith,

*Lewellen* held:

> As stated by the Fifth Circuit, "[a] bad faith showing of this type [—retaliatory
> prosecution—] will justify an injunction *regardless* of whether valid convictions
> conceivably could be obtained."  *Fitzgerald,* 636 F.2d at 945 (emphasis added);
> *see also Bishop v. State Bar,* 736 F.2d 292, 294 (5th Cir.1984); *cf. Wilson v.
> Thompson,* 593 F.2d 1375, 1387 (5th Cir.1979) (preliminary injunction of state
> criminal proceeding permissible if: (1) conduct retaliated against is
> constitutionally protected; and (2) prosecution is motivated at least in part by
> purpose to retaliate or deter).

*Lewellen v. Raff*, 843 F.2d 1103, 1112 (8th Cir. 1988).

As set forth above, during a conference with Marohn, members of the Complaint

Committee actually expressed their concerns that Marohn was describing himself as a

"professional engineer" in his political advocacy.  The Complaint Committee chair, Keith

Rapp, specifically stated he was concerned over reference to Marohn's engineering

credentials during Marohn's public speaking appearances, specifically "Tedx, "The

American Conservative", and "Talks on Google."  Eric Friske, a member of the

Complaint Committee, questioned Marohn about how credentials are represented in a

spoken podcast format.  Most egregiously, Paul Vogel, a member of the Complaint

40

Committee, stated his concern that people listening to Marohn speak during his public advocacy listeners may rely more on what Marohn is advocating based on Marohn stating he is a professional engineer. *Complaint, ¶46.* Simply put, the Complaint Committee admitted that it was targeting Marohn because Marohn identified himself as a professional engineer while engaged in political speech.

As set forth in *Lewellen,* all Marohn needs to prove establish "bad faith" under *Younger* is that the speech is constitutionally protected (which Marohn's unequivocally is) and that the Board's was motivated "at least in part by purpose to retaliate or deter" Marhon's constitutionally protected speech. Vogel's statement that he was wanted to stop Marohn from identifying himself as a professional engineer because public advocacy listeners may rely more on what Marohn is advocating based on Marohn stating he is a professional engineer establishes "bad faith."

Not only is the law that the Board seeks to enforce against Marohn patently unconstitutional, but the Board is on notice of its patent unconstitutionality because Marohn brought this suit—thus calling the Board's attention to the patent unconstitutionality—before the Board began its enforcement action against Marohn in the Office of Administrative Hearings (OAH). *Defs.' Mem. Supp. Dismissal* 4. The Board's decision to proceed with its enforcement action after Marohn put the Board on notice of the law's constitutional infirmity shows bad faith.

As explained above, this is not even a close case. *Alvarez* is an insurmountable obstacle to the Board succeeding on the merits. Marohn was honestly mistaken in that he did not realize that his license had lapsed, but even if, for the sake of argument, he

admitted that he lied and lied to deceive people, it would make no difference under

*Alvarez*. As long as his speech was fully protected—and it was—the First Amendment

protects his right to lie through his teeth, just as it protected the right of the defendant in

*Alvarez* to flat-out lie about having won the Medal of Honor.

And the Board's own memorandum evidences an awareness that the Board has no

good-faith argument that Marohn's description of himself as a "professional engineer"

was somehow not protected. The Board's approach to addressing the merits of Marohn's

claim that he had the right to speak as he did (the complaint's count I) is revealing. The

Board acknowledges that, under *Alvarez*, "lies are still protected by the First Amendment

in some contexts." *Defs.' Mem. Supp. Dismissal* 13 (citing *Alvarez*, 567 U.S. at 718

(plurality opinion)). And the Board does not even argue that the Board could punish

Marohn's speech if that speech were protected the same way as the defendant's speech

in *Alvarez* was protected. *See id*. The Board's *only* argument for why *Alvarez* permits

the Board to punish Marohn is that *Alvarez* is distinguishable because it involved

"noncommercial speech." *Id*. But, as already explained, Marohn's speech was not

commercial because it did not involve marketing or advertising a good or service. And,

just as the Board does not even argue that Marohn's speech could be punished if

*Alvarez* applied, the Board does not even argue that Marohn's speech proposed a

commercial transaction (the real test that defines commercial speech). Instead, as

already explained, the Board attempts to mislead this Court about the commercial-

speech doctrine's actual scope—that is the Board's strategy on the merits. *Defs.' Mem.*

*Supp. Dismissal* 9-12, 13.

This Board's evasiveness demonstrates the Board really is proceeding without hope of success. The Board knows that it will lose, and the Board has no honest argument that it may constitutionally punish Marohn's use of the term "professional engineer." Marohn respectfully asks this Court to accept jurisdiction and to rebuke the Board for its attempt to deceive the tribunal.

## CONCLUSION

Marohn has not practiced as an engineer in over nine years and has no intention to do so. As a result, the Board has no interest in sanctioning Marohn for describing himself as an engineer because Marohn will not implicate the state's alleged interest: protecting against the unauthorized practice of engineering. Rather, the Board is seeking to sanction Marohn because of his political advocacy. In fact, the Board's enforcement action is based *entirely* on Marohn's political speech. Because Minn. Stat. §326.02, subd. 3(b), as applied to Marohn, violates the First Amendment, and because *Younger* abstention does not apply, this Court should deny Defendants' motion to dismiss or stay this action pending resolution of the state administrative proceedings.

Dated: July 1, 2021

*/s/William F. Mohrman*
William F. Mohrman, #168816

Mohrman, Kaardal & Erickson, P.A.
150 South 5th Street, Suite 3100
Minneapolis, MN 55402
Telephone: 612-341-1074
Facsimile: 612-341-1076
Email: mohrman@mklaw.com
*Attorneys for the Plaintiff Charles L. Marohn, Jr.*