UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Charles L. Marohn, Jr., | Case No.: 21-CV-01241 (JRT/LIB) |
| Plaintiff, | |
| v. | |
| | **DEFENDANTS' REPLY** |
| The Minnesota Board of Architecture, Engineering, Land Surveying, Landscape Architecture, Geoscience, and Interior Design, et al., | **MEMORANDUM** |
| Defendants. | |

Plaintiff Charles Marohn incorrectly claims that he had the right to falsely hold himself out as a professional engineer under the guise of so-called "political advocacy." Marohn's claims of being a professional engineer constitute commercial speech and thus are entitled to no First Amendment protection. Moreover, the Court should not reach Marohn's First Amendment arguments because *Younger* abstention directs that the pending state action against Marohn be allowed to proceed. The Court should grant the Defendants' motion to dismiss.

## FACTS

Marohn largely bases his arguments on the Board's discipline against him. (*E.g.*, Pl.'s Br. 3, 16.) But the regulatory proceeding against Marohn thus far has solely involved the Board's complaint committee and has not yet resulted in any findings or discipline against Marohn.

1

First, despite the explanation in the Board's principal brief, Marohn continues to erroneously conflate the Board and the complaint committee. (Defs.' Br. 3–4, 4 n.2.) The Board is composed of twenty-one members, only five of which comprise the committee. Minn. Stat. § 326.04 (2020); Minn. Bd. AELSLAGID, *Board Members*, https://www.mn.gov/aelslagid/board.html (last visited July 12, 2021). Until Marohn filed his complaint in this case, the remaining sixteen were unaware that the committee was investigating Marohn. It is incorrect for Marohn to claim that the Board as a whole has been involved in the actions against him up to this point.

Moreover, the proceedings against Marohn have not yet resulted in any discipline. The committee will have to prove its allegations to an administrative law judge and convince the Board's final decision-makers that Marohn's conduct warrants discipline under Minnesota law. Marohn will have the opportunity to raise any constitutional arguments (as well as any other arguments) he wishes to make through the contested-case and appeal process provided for by Minnesota law. The Board may ultimately conclude that no violations occurred or that no discipline is warranted.

## ARGUMENT

Marohn claims that he had a First Amendment right to falsely hold himself out as a professional engineer while his license was inactive because he failed to renew it, that the Board cannot discipline licensees for lying on their license applications, and that the Court should not abstain from hearing this case under *Younger* abstention because exceptions apply. These arguments lack merit. Marohn had no First Amendment right to falsely hold

2

himself out as a professional engineer, Marohn had no First Amendment right to lie on his license application, and Marohn does not qualify for an exception to *Younger* abstention.

**I.      MAROHN HAD NO FIRST AMENDMENT RIGHT TO FALSELY HOLD HIMSELF OUT AS A PROFESSIONAL ENGINEER WHILE HIS LICENSE WAS INACTIVE.**

Marohn devotes much of his First Amendment argument to explaining the professional speech doctrine and arguing that, because the Supreme Court rejected that doctrine as a distinct category of speech, it cannot serve as a basis for the committee's enforcement action against him. (Pl.'s Br. 18–22.) This is a strawman argument because the committee has never argued that the professional speech doctrine applies to Marohn. That doctrine, when it was recognized by circuit courts, permitted states to regulate speech professionals made within the context of providing services "based on their expert knowledge and judgment." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2371 (2018). Instead, the committee alleged that Marohn is subject to discipline because his false claims to be a professional engineer constitute "commercial speech," a category long recognized by the Supreme Court as being subject to *no* First Amendment protections for falsehoods. *See Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 563 (1980) ("[T]here can be no constitutional objection to the suppression of commercial messages that do not accurately inform the public . . . .").

Marohn nevertheless claims that commercial speech should be narrowly defined and that falsely holding oneself out a professional engineer—including on websites, in solicitations for paid seminars, and in books and other publications—is not commercial speech. (Pl.'s Br. 25.) More specifically, Marohn contends that commercial speech is

3

limited to speech that "proposes a commercial transaction." (*Id.*) While the Supreme Court has said, "speech that proposes a commercial transaction . . . is what defines commercial speech," even Marohn concedes the Court has not been so rigid in applying this "definition." *Bd. of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 482 (1989); (Pl.'s Br. 26 ("The Supreme Court might not have limited the doctrine to 'concrete offers' that constitute an offer in the law-school offer-and-acceptance sense . . . .")).

  The seminal test for reviewing commercial speech that does not contain falsities (as opposed to the underlying case, where committee seeks discipline based on allegedly false speech) has come to be known as the "*Central Hudson* inquiry." *E.g.*, *1-800-411-Pain Referral Serv., LLC v. Otto*, 744 F.3d 1045, 1055 (8th Cir. 2014). But even in *Central Hudson*, the Court applied a commercial-speech analysis to speech that did not propose a commercial transaction. On the contrary, the speech in that case were advertisements "promot[ing] the use of electricity." *Central Hudson*, 447 U.S. at 558. These advertisements were inserted in utility bills and did not propose any transactions: the power company had a monopoly, customers already had contracts for service, and the advertisements (among other things) encouraged consumers to use more electricity. *See Consol. Edison Co. of N.Y., Inc. v. Pub. Serv. Comm'n*, 390 N.E.2d 749, 752, 757 (N.Y. 1979), *rev'd sub nom. Central Hudson*, 447 U.S. 557. The Court nevertheless held that the state order prohibiting those advertisements "restricts only commercial speech." *Central Hudson*, 447 U.S. at 561. Likewise, in *Bolger v. Youngs Drug Prods. Corp.*, the Court held that advertisements that included informational pamphlets that "cannot be characterized merely as proposals to engage in commercial transactions" were nevertheless wholly

within the realm commercial speech. 463 U.S. 60, 67 (1983). This was despite the fact that the pamphlets included discussions of "important public issues." *Id.* at 67–68.

Applying *Bolger*, the Fourth Circuit has likewise recognized that the Supreme Court has not "issued any determinative standard by which to assess if a message is commercial speech." *Handsome Brook Farm, Inc. v. Humane Farm Animal Care, Inc.*, 700 F. App'x 251, 257 (4th Cir. 2017). Instead, the circuit identified the following four qualities of commercial speech: whether the message "is economically motivated," "promotes a specific product," "is an advertisement," and "is placed in a commercial context and is directed at the providing of services rather than toward an exchange of ideas." *Id.* In *Handsome*, the Fourth Circuit applied these factors to an email by an egg-certification organization, noting that the organization received revenue from the sales of eggs that had its certification, that the email encouraged grocers to switch to certified eggs, and it was placed in a commercial context by supporting the certification's usage in the production and sale of eggs. *Id.* at 258–60.

Marohn's claims to be a professional engineer are of a similar vein: Marohn receives revenue from people buying his book and attending his courses; the use of the professional engineer title serves to give him subject-matter credibility and make people more likely to pay for those books and courses; and his claims are placed in a commercial context because they are included in biographies in both the books and online for potential buyers to review before making a decision on whether to purchase a book or course.

Additionally, even under Marohn's overly narrow view of commercial speech, his claims of being a professional engineer qualify as commercial speech. Assuming

5

commercial speech is limited to statements that "propose a commercial transaction," holding oneself out as a "professional engineer" constitutes an implicit offer to perform services related to professional engineering. The Supreme Court held as much in *Friedman v. Rogers*, where it held that the use of a trade name alone, even unaccompanied by any statements such as "I can sell you X good for Y price," or the more general "X goods for sale," because the use of the trade name alone "is a form of advertising." 440 U.S. 1 at 8 (1979). The trade name alone "may serve to identify an optometrical practice and also to convey information about the type, price, and quality of services offered for sale in that practice," and thus the use of the name alone is a "proposal of a commercial transaction." *Id.* at 11. Likewise, Marohn's claims to be a professional engineer identify him as being able to apply engineering sciences to review and critique the professional services provided by his peers. Marohn's professed decision not to perform work as an engineer is irrelevant. His alleged repeated, false representations to the public in the context of professional engineering that he was a professional engineer qualifies as commercial speech.

Marohn also used the professional engineering title in publicity and marketing campaigns to get people to buy goods and services. It is undisputed that Marohn identified himself as a professional engineer in his biographies on both his website and in the "About the Author" section of his 2019 book. (Compl. ¶ 33(h); Pl.'s Br. 16.) The obvious reason for doing so is that this professional credential makes people more likely to buy the book and pay for the courses—including an eight-course bundle for $949 providing thirty-two hours of continuing education credits—offered by Marohn on the site. *See generally Strong Towns Academy*, STRONG TOWNS, https://academy.strongtowns.org/ (last visited July 7,

6

2021).¹ That is to say, Marohn used the title as an indicator of the type and quality of information available for purchase. Even under the narrowest reading of what constitutes commercial speech, such claims fall within the category. And, because they were false, they are subject to *no* First Amendment protection.

Marohn nonetheless insists that his false claims about being a professional engineer are not commercial speech because "he made them in the course of political advocacy." (Pl.'s Br. 29.) But, even if some of Marohn's speech was noncommercial, that speech does not permit him to falsely claim to be a professional engineer. When speech contains both commercial and noncommercial elements, courts look to see whether the speech is so "inextricably intertwined" that the entirety must be classified as noncommercial. *Fox*, 492 U.S. at 474. If they are not so intertwined, then the commercial speech may be independently considered, regardless of the fact that noncommercial speech also occurred. *See id.*

In *Fox*, for example, the Court held that speech at Tupperware parties, which contained both offers to sell goods and noncommercial advice about home economics, was not so inextricably intertwined so as to exempt the speech related to sales from the commercial speech doctrine. *Id.* The Court reasoned that the speech was not inextricably intertwined because, "[n]o law of man or of nature makes it impossible to sell housewares

---

¹ The Court may consider the contents of Marohn's organization's website and Marohn's book as "documents necessarily embraced by the complaint," which include "documents whose contents are alleged in a complaint and whose authenticity no party questions." *Ashanti v. City of Golden Valley*, 666 F.3d 1148, 1151 (8th Cir. 2012). Marohn discusses the website and publications at numerous points in the complaint. (*E.g.*, Compl. ¶¶ 3, 33, 41.)

without teaching home economics, or to teach home economics without selling housewares." *Id.* Similarly here, nothing makes it impossible for Marohn to claim to be a professional engineer without advocating for particular public-works projects, nor is it impossible for him to advocate for those projects without claiming to be a professional engineer. Accordingly, even if the Court accepts Marohn's argument that his allegedly false licensure claims were made in the course of political advocacy, the false claims can still be separated as out commercial speech, entitled to no First Amendment protection.

Marohn also relies on *Serafine v. Branaman*, 810 F.3d 354 (5th Cir. 2016), where the Fifth Circuit held that a political candidate could falsely claim to be a psychologist. (Pl.'s Br. 27.) That reliance is misplaced. In *Serafine*, the court acknowledged that states can limit the use of titles and trade names to protect the public from false advertising, but then held unconstitutional the application of such statutes to the candidate's campaign statements. 810 F.3d at 360–61. But *Serafine* is inapposite to the facts of this case. There, the plaintiff made the false claims in the context of a campaign for political office, an enterprise entirely unrelated to her qualifications to practice psychology and her false claims were not included in any "promotional flyer seeking clients." 810 F.3d at 360. In contrast, Marohn's false statements were not made in a campaign for political office; rather, he falsely claimed to have a professional engineer license in conjunction with selling books and seminars related to making recommendations for changes to civil engineering policies. Such activities have a clear connection with the license in question, such that members of the public are considerably more likely to rely on Marohn's false statement that he was licensed as compared to those of the candidate in *Serafine*.

8

Moreover, *Serafine* is a Fifth Circuit case, and thus is not binding on this Court. Even if the Court believes *Serafine* is factually similar, its legal analysis suffers from the same flaws as Marohn's arguments. *Serafine* takes the overly simplistic view that because the plaintiff was "seeking votes, not clients," her speech could not be commercial speech. *Id.* at 361. As previously discussed, commercial speech is not so limited. Nor is the mere subjective test of what the speaker was "seeking" used by the Fifth Circuit appropriate. Instead, courts look at factors like those identified in *Handsome*: whether the message "is economically motivated," "promotes a specific product," "is an advertisement," and "is placed in a commercial context and is directed at the providing of services rather than toward an exchange of ideas." 700 F. App'x at 257.

Finally, Marohn also cites *Järlström v. Aldridge*, 366 F. Supp. 3d 1205 (D. Or. 2018), claiming that the laws struck down there were "virtually identical" to section 326.02. (Pl.'s Br. 29.) This argument lacks merit. *Järlström* struck down laws prohibiting the use of the title "engineer" without a license. But *Järlström* did so because "engineer" is broad and without a fixed meaning. *Id.* at 1220. Furthermore, *Järlström* specifically left intact Oregon's prohibition on using the title "*professional* engineer" without a license, which Marohn is specifically challenging in this case. *Id.* at 1222 ("Courts have long recognized that the term 'engineer' has a generic meaning separate from 'professional engineer' . . . ."). As explained in the Board's opening brief, "professional engineer" has a fixed meaning like other titles for which courts have upheld restrictions. (Defs.' Br. 12.) *Järlström* therefore supports dismissal of Marohn's complaint.

## II.   MAROHN HAD NO FIRST AMENDMENT RIGHT TO LIE ON A STATE LICENSE APPLICATION.

Marohn claims that *United States v. Alvarez*, 567 U.S. 709 (2012), forecloses discipline against him based on him allegedly lying on his license renewal applications. (Pl.'s Br. 23.) But *Alvarez* makes clear that if a person lies on a government application, the government may discipline the person for that lie.

In *Alvarez*, a plurality of the Court held that the First Amendment applies to false statements. *Id.* at 718 (plurality opinion). But after reaching that holding, the plurality went on to note three types of lies that courts had generally found permissible, two of which are relevant here. First, the plurality noted that "the criminal prohibition of a false statement made to a Government official," was generally permissible. *Id.* at 720. This is precisely the type of statement at issue here because Marohn falsely reported to the Board that he had not represented himself as a professional engineer without proper licensure when he reactivated his license after an almost two-year lapse. (Compl. ¶ 40.) If "criminal prohibition" of such false statements is generally permissible under the First Amendment, then certainly the Board has the authority to impose lesser sanctions by disciplining a licensee for making false statements upon reactivating his license.

Second, the plurality also recognized the "unquestioned constitutionality of perjury statutes." *Alvarez*, 567 U.S. at 720. The plurality reasoned that, "perjury undermines the function and province of law and threatens the integrity of judgments that are the basis of the legal system." *Id.* at 720–21. The plurality went on to note that, "unlike speech in other contexts, testimony under oath has the formality and gravity necessary to remind the

witness that his or her statements will be the basis for official governmental action." *Id.* at 721. The certification regarding representing oneself as an engineer has much in common with such statutes. Like people giving court testimony, license applicants are required to "declare that everything [they] have stated in [their application] is true and correct" and are aware that those statements will be the basis for official governmental action. (Compl. Ex. 1 at 2.) Additionally, lying on those certifications undermines the function and province of Board licensure and threatens the integrity of the licenses that are issued based on them. In light of these twin approvals, *Alvarez* supports the Board's position that if someone lies on their application, the Board may subject that person to discipline.

### III.   THIS CASE SHOULD BE DISMISSED UNDER THE *YOUNGER* ABSTENTION DOCTRINE.

Marohn argues the Court should not dismiss under the *Younger* abstention doctrine for four reasons: (1) forcing him to defend against a state-level proceeding would create First Amendment chilling effects, (2) Minnesota has no interest in policing the use of professional titles, (3) section 326.02 is "patently" unconstitutional, and (4) the complaint committee's action against him was initiated in bad faith. Each argument lacks merit. *Younger* considered the chilling effects of being forced to defend a state-level action and nevertheless held abstention was appropriate. Minnesota has a clear interest in policing the use of professional titles by an inactive licensee. Section 326.02 is not unconstitutional. Finally, Marohn pleaded no facts establishing bad faith by the committee's members.

### A.     *Younger* Rejected Marohn's Chilling-Effects Argument.

Marohn argues that the Court should not abstain under *Younger* because, in the context of other types of abstention, the Supreme Court has held that abstention may be inappropriate for First Amendment cases because the very act of forcing the plaintiff into state court may chill protected speech. (Pl.'s Br. 32.) But, regardless of what the Court has said regarding the First Amendment and other types of abstention, *Younger* expressly considered and rejected this argument as applied to *Younger* abstention.

The district court in *Younger* took the position now advanced by Marohn that injunctions were available against state-level proceedings when a plaintiff alleged that a state statute was vague or overbroad in violation of the First Amendment. *Younger v. Harris*, 401 U.S. 37, 50 (1971). In reversing the district court, the Supreme Court held that, "the existence of a 'chilling effect,' even in the area of First Amendment rights, has never been considered a sufficient basis, in and of itself, for prohibiting state action." *Id.*; *see also Ohio C.R. Comm'n v. Dayton Christian Schs., Inc.*, 477 U.S. 619, 628 (1986). Accordingly, Marohn's argument that First Amendment claims are exempt from *Younger* abstention is erroneous.

### B.     **Minnesota Has an Interest in Enforcing Its Licensing Laws.**

For *Younger* abstention to apply, the parallel state proceeding must implicate an important state interest. *Plouffe v. Ligon*, 606 F.3d 890, 892–93 (8th Cir. 2010). In its opening brief, the Board established its interest in regulating the conduct of its licensees and their professional titles. (Defs.' Br. 7.) The Supreme Court has recognized such interests as valid. *Middlesex*, 457 U.S. at 434. Marohn nevertheless argues there is no such

interest here because the committee is pursuing discipline against him for claiming to be a professional engineer when he was not engaging in the preparation of engineering plans. (Pl.'s Br. 37.) In making this argument, Marohn misconstrues the state-interest inquiry of *Younger*, which looks to the generic importance of the proceedings to the state generally, *not* to the importance of the fact-specific issues of the particular proceeding.

When courts inquire into the substantiality of the state's interest for *Younger* purposes, they "do not look narrowly to its interest in the outcome of the particular case." *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 365 (1989). Rather, courts look to "the importance of the generic proceedings to the State." *Id.* For example, in *Younger,* the Court did not look to the importance of the state's interest in prohibiting the particular plaintiff from distributing handbills; instead, the Court looked at the very broad interest of "'carrying out the important and necessary task' of enforcing its criminal laws." *New Orleans*, 491 U.S. at 365 (quoting *Younger*, 401 U.S. at 51–52). Likewise, in considering a First Amendment challenge to sex-discrimination statutes, the Court did not look at the state's interest in a particular Christian school's firing of a particular individual; instead, the Court looked at the state's more general interest in preventing sex discrimination. *Id.* (citing *Ohio C.R. Comm'n*, 477 U.S. at 619, 628).

Here, the Board's interest, properly construed, is in regulating the conduct and professional titles of its licensees to prevent the public from being misled. Thus, Marohn's argument that the state has no interest in this particular matter because the alleged lies about his qualifications were not made in the context of creating engineering plans is misplaced. First, Marohn's argument fundamentally misconstrues the Court's inquiry. For the

13

purposes of *Younger* abstention, the particulars of Marohn's conduct are immaterial. The proper inquiry is whether the Board generally has an interest in prohibiting unlicensed individuals from using the professional engineer designation. Marohn does not dispute this general interest. Second, even if the Court accepts Marohn's overly narrow interest inquiry, the Board has an interest in disciplining Marohn under these specific facts. As discussed in detail above with respect to Marohn's First Amendment arguments, the Board has an interest in prohibiting people from falsely claiming to be professional engineers and particularly when their licenses are inactive. In light of these considerations, the state-interest requirement of *Younger* is satisfied.

### C. The Patently Unconstitutional Exception to *Younger* Does Not Apply.

Marohn claims that the Court should not abstain under *Younger* because Minnesota's prohibition on falsely claiming to be a professional engineer is "patently unconstitutional" (and that the supposed facial overbreadth of the statute undercuts the applicability of *Younger* abstention). Marohn's arguments fail because the statute is not unconstitutional and, moreover, Marohn did not plead a facial challenge.

For the reasons explained in section I, the application of section 326.02 to Marohn is not unconstitutional. And even if the Court has some concerns about the constitutionality of that application, the multitude of cases cited by the Board upholding the application of similar statutes shows that applying the statute to Marohn is not so "patently" unconstitutional as to justify disrupting the state-level proceedings. (Defs.' Br. 11–12.) As Marohn acknowledges, this exception to *Younger* requires "that a state official pursues an enforcement action without hope of obtaining a valid conviction." (Pl.'s Br. 38.) Even if

there were disputes about the constitutionality of the committee's pending action, if nothing else, there is certainly a "hope" of obtaining a valid disciplinary order against Marohn.

Marohn also argues that *Younger* abstention is inappropriate because "a facial overbreadth challenge to a statute under the First Amendment . . . supports declining to abstain under *Younger*." (Pl.'s Br. 38.) But this argument suffers from a significant procedural defect: Marohn did not allege a facial challenge to section 326.02. Marohn brought a First Amendment as-applied challenge and a First Amendment retaliation claim. (Compl. 18–19.) Thus, Marohn's arguments regarding facial-overbreadth challenges are irrelevant to the Board's motion to dismiss his complaint.

### D. Marohn Did Not Plead Any Facts Establishing Bad Faith.

Marohn's final argument against *Younger* abstention is that abstention is inappropriate because the committee's enforcement action is in bad faith. But Marohn has not pleaded any facts that would establish bad faith to overcome *Younger* preemption.

Marohn identifies his evidence of bad faith as statements by committee members that they were concerned "that Marohn was describing himself as a 'professional engineer' in his political advocacy." (Pl.'s Br. 40.) In particular, Marohn points to a statement by one committee member that he was concerned that "people listening to Marohn speak during his public advocacy . . . may rely more on what Marohn is advocating based on Marohn stating he is a professional engineer." (*Id.* at 41.) But far from showing some nefarious motive on the part of the committee, it shows that the committee's action was taken as part of its commitment to protecting the public. The committee was concerned that people would pay to obtain and subsequently rely on Marohn's advice—advice apparently

germane enough to engineering that Marohn identified himself as a professional engineer when giving it—because they believed that Marohn was a licensed professional engineer when in fact he had no such license. Moreover, Marohn's focus on *where* his false claims were made is misplaced. Even looking at only the three out-of-context statements Marohn chose to include in his complaint, it is apparent that the committee's concern was how Marohn was presenting his credentials, *not* with the fact that he was doing so as part of political advocacy. (Compl. ¶ 46.)

It is also noteworthy that Marohn pleaded no facts indicating the committee members were concerned about (or even aware of) the *content* of Marohn's political advocacy. Rather, Marohn's pleadings establish only that the committee was concerned that Marohn was falsely claiming to be a professional engineer and that the public would rely on that false representation. This is insufficient to establish bad faith. The Eighth Circuit has laid out numerous examples of circumstances that would constitute bad faith: where prosecutors have instituted charges in violation of a prior immunity agreement; where a prosecutor has pursued highly questionable charges against the plaintiff apparently for the sole purpose of gaining publicity for the prosecutor; where a prosecution is motivated by a purpose to retaliate for or to deter the filing of a civil suit against state officers; and where a prosecution has been instituted to harass and punish the plaintiffs for having exercised their First Amendment rights. *Lewellen v. Raff*, 843 F.2d 1103, 1112 n.10 (8th Cir. 1988). None of these circumstances are present here. The closest Marohn comes is in baldly alleging that a committee member wanted to retaliate and deter Marohn's public advocacy. (Pl.'s Br. 41.) But Marohn failed to support it with any factual allegations.

Instead, he merely points to the member's concern that listeners may rely more on what Marohn is advocating because of his allegedly false claims of licensure. This does not indicate or even imply that the committee's action was based on the *content* of Marohn's protected First Amendment advocacy; rather the committee's action was based on Marohn's false qualification claims, which are not protected. Because these facts do not support a finding of bad faith, and these are the only facts on which Marohn relies to do so, Marohn does not meet the bad faith exception to *Younger* abstention.

## CONCLUSION

Marohn has not established an exception to *Younger* abstention. And even if he had, his First Amendment arguments are meritless. Accordingly, the Court should grant the Defendants' motion and dismiss this case.

Dated: July 14, 2021

Respectfully submitted,

KEITH ELLISON
Attorney General
State of Minnesota

s/**Christopher M. Kaisershot**
CHRISTOPHER M. KAISERSHOT (#0268665)
ALLEN COOK BARR (#0399094)
Assistant Attorneys General

445 Minnesota Street, Suite 1400
St. Paul, Minnesota 55101-2131
(651) 757-1487 (Voice)
(651) 297-1235 (Fax)
allen.barr@ag.state.mn.us
christopher.kaisershot@ag.state.mn.us

ATTORNEYS FOR DEFENDANTS